UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        .
                                 .
            Plaintiff,           .   CR No. 21-0222 (TFH)
                                 .
       v.                        .
                                 .
01 JULIAN ELIE KHATER,           .   Washington, D.C.
02 GEORGE PIERRE TANIOS,         .   Tuesday, May 11, 2021
                                 .   9:00 a.m.
            Defendants.          .
. . . . . . . . . . . . . . . . .

TRANSCRIPT OF BOND HEARING
VIA VIDEOCONFERENCE
BEFORE THE HONORABLE THOMAS F. HOGAN
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:          GILEAD I. LIGHT, AUSA
                             ANTHONY F. SCARPELLI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street NW
                             Washington, DC 20530
                             (202) 252-7566

For Defendant Khater:        JOSEPH TACOPINA, ESQ.
                             CHAD SEIGEL, ESQ.
                             275 Madison Ave
                             Suite Fl 35
                             New York, NY 10016
                             (212) 227-8877

For Defendant Tanios:        ELIZABETH GROSS, ESQ.
                             L. RICHARD WALKER, ESQ.
                             Federal Public Defender Office
                             230 West Pike Street
                             Suite 360
                             Clarksburg, WV 26301
                             (304) 622-3823

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186

C O N T E N T S

WITNESS TESTIMONY

WILLIAM SCOTT BIDDLE:   Direct Examination................... 5
                        Cross-Examination................... 8

1                    P R O C E E D I N G S

2              THE DEPUTY CLERK:  Your Honor, this morning this is

3    the matter of United States versus Julian Khater and Codefendant

4    George Tanios, Criminal Action 21-222.  I'll ask the parties to

5    identify yourselves for the record.

6              MR. LIGHT:  Good morning, Your Honor.  Gilead Light

7    and Anthony Scarpelli for the United States.

8              THE COURT:  Thank you.

9              MS. GROSS:  Good morning, Your Honor.  Beth Gross

10   and Richard Walker representing Mr. Tanios.

11             THE COURT:  All right.  Thank you.

12             MR. TACOPINA:  Good morning, Your Honor.

13   For Mr. Khater, Joseph Tacopina and Chad Seigel along with --

14   is Alvin there?  I'm not sure.  Other counsel, Alvin Thomas.

15             THE COURT:  Thank you, Mr. Tacopina.

16        All right.  And we have the two charged individuals,

17   Mr. Khater, Mr. Tanios.  Can you hear us, right?  All right.

18   We're ready to proceed in this matter.

19        To go back a bit, I think it was on April 27th we held the

20   bond hearing after briefing and subsequently had a reply brief

21   on Mr. Tanios' behalf where we listened to the arguments of

22   counsel and the presentations by the government by the video

23   evidence and the other evidence seized from the backpack of

24   Mr. Tanios.  At the conclusion of that, because of the time

25   frames, we said we would come back as soon as possible to

1    conclude the matter and for the Court to make rulings.

2        Mr. Tacopina had, hopefully, a successful experience

3    with the doctors, and so we put that off.

4            MR. TACOPINA:  I'm here.  I'm here, Your Honor.

5            THE COURT:  So we put it off until today.  That was

6    the alternate date that we had.  So we're ready to proceed at

7    this time.

8        And I just for the record indicate, I reviewed again the

9    videos as shown previously.  I reviewed the pleadings of the

10   parties, the most recent filings, all the materials submitted

11   on behalf of Mr. Khater, the 18, 19 letters on his behalf; and

12   the materials for Mr. Tanios, his family situation, his work

13   history, et cetera.

14       And so I'm ready to hear any additional arguments, and

15   then I'll issue a ruling today.  A bench ruling is how we'll

16   go forward.  I thought that Ms. Gross had wished to conclude --

17   her time got cut a little short because I spent a lot of time

18   on Mr. Khater's issues, so let me --

19           MS. GROSS:  Yes, Judge.  Thank you so much.  I did

20   ask if I could possibly put on one short witness for the Court

21   today, who's in the waiting room.  It should be maybe 10 minutes

22   tops.  I don't think it'll take longer than that.

23           THE COURT:  That's fine.

24           MS. GROSS:  Okay.  Thank you, Judge.  His name is

25   Scott Biddle.

1          MR. TACOPINA:  And, Your Honor, while we're waiting,

2     if possible, if I could have just five minutes at the end based

3     on some recent submissions since our last appearance?

4          THE COURT:  Sure.

5          MR. TACOPINA:  I will not reargue anything

6     I've already argued.  About five minutes, if that's okay.

7          THE COURT:  That's fine.

8          MR. TACOPINA:  Thank you, Your Honor.

9          MS. GROSS:  Mr. Biddle, is that you?  Mr. Biddle,

10    can you hear me?  This is Beth Gross.  Mr. Biddle?  Mr. Biddle.

11         THE COURT:  Mr. Biddle, can you hear the Court?

12    We aren't hearing you.  We can hear other people, but we

13    can't hear you.

14         MS. GROSS:  Judge, I'm going to -- oh.

15         THE DEPUTY CLERK:  Good morning, Mr. Biddle.

16      Can you hear loud and clear, sir?

17         THE WITNESS:  Yes.  Thank you.

18         THE COURT:  Raise your hand, please.

19    WILLIAM SCOTT BIDDLE, WITNESS FOR DEFENDANT TANIOS, SWORN

20                    DIRECT EXAMINATION

21    BY MS. GROSS:

22    Q.  Mr. Biddle, if you could just tell the Court your name,

23    who you are, and where you work.

24    A.  My name is William Scott Biddle.  I work at ATR Performance

25    in Morgantown, West Virginia, and I am the manager/car care.

1    Q.    Okay.  And what is ATR?  What kind of store is that?

2    A.    It is a firearms and accessory store.

3    Q.    Okay.  And how long have you worked there?

4    A.    Right around two years now.

5    Q.    Okay.  I'm just going to kind of quickly get to the point,

6    Mr. Biddle.  Can you describe -- do you know Mr. Tanios?

7    A.    I do.

8    Q.    How do you know him?

9    A.    He comes into the shop, has bought a few items from me

10   in the past.  He also helped out with a cook that I did for

11   the homeless over Christmastime, donating some things.

12   Q.    Okay.  So it's fair to say you've known Mr. Tanios for a

13   period of time prior to January of this year?

14   A.    Correct.  Yes.

15   Q.    And when I'm talking about January of this year, Mr. Tanios

16   came into your store at ATR Morgantown.  Is that right?

17   A.    That is correct.

18   Q.    And can you just describe the events that day, when he

19   came into the store, the entire situation that day?  Just

20   describe that for the Court.

21   A.    Sure.  So he came in.  It was getting close to closing

22   time, I believe.  He came in, and he chatted with me for a

23   second and then very quickly got a phone call, chatted with the

24   person on the phone for a second, let me know that he was going

25   to go down to the rally in D.C., the Trump rally, and he was

1    concerned about being protected while he was there.

2        So he asked me if he could take his firearm with him.

3    I told him that he could not have firearms in D.C.  I happened

4    to have a -- like a little pepper-ball shooter sitting beside

5    the register.  He asked if he could take that item with him.  I

6    told him that he couldn't have anything that fired a projectile,

7    which those did, in D.C.

8        And he asked if there was anything that he could take, and

9    I said aerosols are okay.  At that point he kind of turned and

10   looked -- we have an end cap that has some mace and some other

11   stuff like that on there, and he went over, said, so this stuff

12   I can have in D.C.?  And I said, yes, you can have that stuff in

13   D.C.  He picked out a few items; he come over; I rang him up.

14   I think maybe he got another phone call before he left; I'm not

15   a hundred percent sure.  I rang him up, we said our goodbyes,

16   and he left.

17   Q.   Okay.  So there was nothing alarming to you about that

18   interaction in the store?

19   A.   Not at all.  He was concerned about his safety, about

20   the car being maybe stopped in traffic, those kind of things,

21   but there was nothing that led me to believe that the events

22   that transpired would have transpired.

23   Q.   Sure.  And if something was alarming about a purchase at

24   the store, what would you to?

25   A.   I would definitely contact -- our contact would be the ATF.

1   We work closely with them in several different situations.

2   I actually spoke with them yesterday about a situation.

3   So, yeah, we'd contact the ATF, and then I would contact

4   my employer and let them know that I did such.

5   Q.   Okay.  And just to follow up on the phone calls, Mr. Tanios

6   was not on the phone the entire time he was in the store?

7   A.   He was not.  He was not.  He was off and on.

8   Q.   Okay.  And that's about it, actually.  Thank you so much,

9   Mr. Biddle.  Appreciate your testimony.

10           THE COURT:  The government can ask questions if they

11  wish.

12           MR. LIGHT:  Very briefly.

13                         CROSS-EXAMINATION

14  BY MR. LIGHT:

15  Q.   Good morning, Mr. Biddle.

16  A.   Good morning, sir.

17  Q.   You didn't travel to Washington, D.C., with Mr. Tanios.

18  Is that correct?

19  A.   No, sir.  I did not.

20  Q.   And you didn't attend the rally in Washington, D.C.

21  Is that correct?

22  A.   No, sir.  I did not.

23  Q.   Mr. Tanios purchased not one but two cans of bear spray

24  sold by -- or manufactured by Frontiersman.  Is that right?

25  A.    I believe that's the manufacturer.  He did purchase two

1    cans of bear spray.

2    Q.   And that's a 7.9 ounce can of spray.  Is that correct?

3    A.   I don't know the weight or ounces.

4    Q.   He also purchased not one but two canisters of mace,

5    or SABRE Red pepper gel, that was attached to a key ring.

6    Is that correct?

7    A.   Correct.

8    Q.   So four canisters in all.  Is that correct?

9    A.   That is correct, sir.

10             MR. LIGHT:  Court's brief indulgence.

11        That's all.  Thank you, Your Honor.

12        Thank you, sir.

13             THE COURT:  Thank you.  If there's nothing else,

14   sir, you can be excused.  Thank you for appearing.

15             THE WITNESS:  Thank you.

16        (Witness exits call.)

17             THE COURT:  All right.  Ms. Gross?

18             MS. GROSS:  Thank you, Judge.  I don't have any

19   further witnesses for the Court.  It just depends on how the

20   Court would like to continue.  If you want to do arguments,

21   I'm happy to start with that.  Just let me know if you want

22   me to go and when you want me to go.

23             THE COURT:  I think it's time to go.

24             MS. GROSS:  Okay.  I'm ready, Judge.

25             THE COURT:  I've reviewed everything again, as I said,

1    and all the filings and pleadings.  Go ahead and let me see

2    what you want me to consider.

3              MS. GROSS:  Thank you, Judge.

4          As the Court noted, we did file a reply at the end of

5    the week that the Court has reviewed, but just to reiterate

6    some of the arguments that have been placed in the pleadings,

7    Mr. Tanios -- we've had many witnesses for this Court and for

8    our magistrate court to review that shows the Court that

9    Mr. Tanios is an ordinary gentleman that lives in Morgantown,

10   West Virginia, in a modest townhome with his fiancée and his

11   three children, who are four and two eight-month-old twins.

12         He graduated high school in New Jersey.  He attended

13   college where he was enrolled until 2001.  He has never been

14   convicted of a felony offense.  Mr. Tanios has never been

15   charged with a crime of violence.  And based on our

16   investigation, he's never had a reputation for violence, Judge.

17         Witnesses had advised he's a strong worker; he has a strong

18   work ethic.  He's a long-standing person in the community in

19   Morgantown.  He owns a restaurant and has owned many restaurants

20   over the last 15 years that people are very familiar with.

21   So his ties to the community here are so strong.  He has a

22   supportive role as a father to his children.

23         And, Judge, his plans -- we proffer to the Court that

24   his only plans were to attend this rally.  The only plan that

25   there's evidence of is to go and to attend the rally with his

friend.  And he wanted to go with another friend that we had for
the Court last time we were here, Sean, tell the Court that he
was planning on going, too, with Mr. Khater and Mr. Tanios.  It
didn't work out for him to attend, but there was no plan.  The
only plan was to go, and Mr. Khater and Mr. Tanios did that.

They went to a rally.  The intent wasn't to go to a riot.
The intent was to go to a rally to support their president,
and that happened last minute.  They ended up going together,
ended up being those two.

And, yes, as we heard from Mr. Biddle, Mr. Tanios did go
to ATR in Morgantown, West Virginia, and purchased four sprays.
He did that.  We don't say that he didn't.  But the intent for
that, as Mr. Biddle told the Court today and we proffer that
Mr. Tanios would tell the Court, is that the purpose of
purchasing those was for self-protection, not against police
and not against bears, but to protect himself from violent
things that were happening at other Trump rallies.

And there's proof of that.  If the Court were to just
Google "Trump rally turns violent," there are many rallies
that ended up turning violent against the Trump supporters,
and that's well known.  So it's not, you know, some far-off or
outlandish fear that Mr. Tanios had.  It was legitimate.  It was
a legitimate fear.  He purchased those sprays legitimately and
took them to Washington, D.C., for a legitimate purpose, to
protect himself, and not to spray police or to harm police or

1   to harm anyone, but to keep them until he needed them for his

2   own self-protection.

3       And we proffer to the Court that when the Court listened

4   to the video that we keep calling the "Convo Couch" video that

5   Mr. Light referred to repeatedly last time we were here, I hope

6   the Court heard some other language from Mr. Tanios.

7       There were other words being said prior to, you know,

8   basically, "we'll use it later."  And I proffer to the Court

9   that "use it later" was for protection for himself: We gotta

10   get to the car later, man.  We gotta make it home tonight.  Not

11   we're going to use it later against the cops.

12         THE COURT:  I don't know what that was for, but I do

13   know we spent an awful lot of time listening to the tapes again,

14   in every way possible you can listen to it, and I cannot hear

15   the language, nah, no, etc., as you have proffered, despite the

16   best attempts to do so.

17       If you had an expert that has gone through it and can

18   isolate that and we can hear it, maybe if that's available at

19   a later date, but right now I can't make a finding that he said

20   don't, in essence, take the bear spray out of the backpack or

21   the mace out of the backpack.

22         MS. GROSS:  Okay.  Well, I'm sorry that the Court

23   could not -- I mean, it's not clear.  I will agree.  It's

24   definitely not clear.  I can hear a lot of words going on in

25   the background.  But I hear, nah, don't do it, is what I've

heard.  And I've listened to it probably a thousand times,
Judge, trying to get of course, you know, the whole context.
But I will proffer to the Court that that is what my staff has
heard every time we listened to the tapes after we put on noise-
canceling headphones.  There's more language there than meets
the eye.

    And even if the Court can't hear that, I think the context
of the video and the conversation of -- even the conversation
the Court can hear, the later aspect of it, it fits with
Mr. Biddle's testimony that Mr. Tanios specifically came into
the store asking what he could take for self-protection at
this rally.  It fits.

    The "nah," the later comment, fits with that testimony
of Mr. Biddle, that Mr. Tanios had no intent to use it for any
purpose other than to get himself home, to protect himself from
anything that might come his way between him and getting home
that day.  And he never had to use it.  He never did use it,
Judge.  He never knew it was used.

    That's the other very important aspect for the Court.
He did not know that day that Mr. Khater went up to that bike
rack and sprayed anybody.  How would he know that?  He was
30 feet back away.  He had no way to see that or have any
knowledge of that.

            THE COURT:  Weren't they communicating on telephones
during this period?

1           MS. GROSS:  Judge, they had one call I think that

2    never connected.  I don't know if it was a few seconds long or

3    not.  I'm sure Mr. Light has the exact seconds that they had

4    together.  But my understanding was that we don't know if that

5    call even connected with each other.

6           So I don't believe that that's in evidence at all that

7    Mr. Khater and Mr. Tanios were communicating at all through

8    this event other than when he came back to find him back in

9    the crowd.  And why else would he come back to find him in

10   the crowd if they were communicating the whole time by phone?

11   Why would he try to find him in the crowd?

12          And, Judge, I just want to say that it's also, you know,

13   in testimony that, you know, Mr. Tanios didn't do anything at

14   the rally other than attend.  He did not personally cause harm

15   to any individual or property.  He traveled there, you know,

16   to just attend.  And the only coordination was him telling

17   Mr. Khater, you know, "not now," basically, with the bear

18   spray and that we're not going to use that.

19          That was a denial, Judge.  That was a denial of the use of

20   the bear spray.  The bear spray was not used that day.  That's

21   what the evidence shows.  The evidence shows the bear spray was

22   never used that day.  The bear spray was found intact at

23   Mr. Tanios's home, and it was a denial of the use of the bear

24   spray.  That conversation was actually an argument.

25          THE COURT:  It was in his backpack that police

1    recovered in his home --

2         MS. GROSS:  Yes.

3         THE COURT:  -- that had the canisters in it.  Right?

4         MS. GROSS:  Yes.

5         THE COURT:  He also had a pistol in it.

6         MS. GROSS:  He had -- I don't believe it had a pistol

7    in the backpack, Judge.

8         THE COURT:  I thought that's in the return of the

9    search warrant.

10        MS. GROSS:  There was a pistol in his home that he

11   gave the police; but it was not in the backpack, and it was not

12   there that day.  No.

13        THE COURT:  All right.  What about the allegations

14   he aided and abetted by allowing Mr. Khater to take that bear

15   spray out, but apparently got clocked at some point you don't

16   see anything on the video, Mr. Khater ends up with a mace can

17   that he uses to spray the police with?

18        MS. GROSS:  You know, our argument on aiding and

19   abetting is that Mr. Tanios didn't aid and abet Mr. Khater in

20   doing anything.  That conversation, as I was trying to tell the

21   Court, was a denial.  It was a denial of the use of the spray.

22   That's what the conversation was.  It was an argument.  It was

23   not participatory.  It was an argument between the two:  No,

24   not now.  No.  We're not doing that.

25        THE COURT:  Well, I thought he said more than that

1    according to the tape I listened to.

2              MS. GROSS:  Later.  And that aspect --

3              THE COURT:  "It's too early."

4              MS. GROSS:  "It's too early."

5              THE COURT:  Yes.

6              MS. GROSS:  And that aspect of the conversation, as

7    I proffered to the Court, goes along with Mr. Biddle's testimony

8    today that the "later" was to use it to protect himself.

9         And, Judge, I just want to go over, you know, this Court

10   has to -- this Court has to find that Mr. Tanios is a danger

11   based on these guideposts, and I'm not seeing how that's possible.

12        He's not a danger based on these guideposts in *Chrestman*.

13   I know that we went over that, kind of ad nauseam, at the last

14   hearing, but I didn't get to kind of weigh in on any of that;

15   and I would, you know, like to briefly.  And it's also not --

16   it's not -- the finding of detention is also not consistent

17   with *Munchel*.

18        *Munchel* requires a finding of articulated, identifiable

19   threats.  Here there is none.  There's been none made.  The

20   government has not articulated what they fear the defendant

21   will do.  What will he do?  And even if they did identify

22   one, it would have to be presented to this Court by clear and

23   convincing evidence that an actual threat actually existed,

24   and we haven't seen that.

25             THE COURT:  Wait a second.  Let's step back a second.

1   He did buy, for whatever reason you proffered, matters or

2   materials that could injure people -- and your position is

3   to protect himself -- but could injure people if he felt

4   threatened.  He brought those to the rally, and he brought

5   those to Capitol Hill.

6          MS. GROSS:  Yes.

7          THE COURT:  There occurred on video a discussion that

8   can be interpreted that he allowed Mr. Khater to take out the

9   bear spray at some point -- you can't see take out the mace --

10  saying "not yet; it's too early."  It could be interpreted

11  different ways.  Looking at it from that point of view, why

12  does that not indicate his culpability in what Mr. Khater did

13  with the spray?

14         MS. GROSS:  By allowing him to take it out?  Judge,

15  my argument is he did not allow him to take it out.  It's a

16  backpack on his body.  What is he going to do?  He takes it out.

17  He doesn't allow it to happen.  They have a conversation that we

18  can't hear fully; and then, according to Mr. Tanios, he doesn't

19  have any -- it went back in the backpack.  The bear spray went

20  back in the backpack.  He thinks it's over.

21         How does Mr. Tanios control Mr. Khater's actions when

22  Mr. Khater's 30 feet ahead of him up at the bike gate?  He

23  cannot control him, he did not control him, and had no ability

24  to control him.  He wasn't a part of it.

25         THE COURT:  What's the difference in that and a bank

1  robber who has a driver waiting in the car?

2         MS. GROSS:  There's no plan in this case, Judge.

3  That's a plan.

4         THE COURT:  He may not be aware of everything that

5  the proposed bank robber's going to do.  It's like a felony

6  murder kind of situation.

7      All right.  Let me move ahead with the government's

8  response to Ms. Gross's presentation concerning her evidence

9  that she has produced that he was taking this for self-

10  protection only, that the words can be read to indicate he was

11  not supporting Mr. Khater taking anything from his backpack and

12  using it against the police and that he was away -- far enough

13  away that he didn't know what Mr. Khater was doing.

14         MR. LIGHT:  Yes, Your Honor.  Thank you.  Before I

15  get to that, let me just as a matter of housekeeping, to make

16  sure I don't forget at the end of the hearing, ensure that we

17  moved all the exhibits presented to the Court into evidence, and

18  that's Exhibits 1 through 17, just for a housekeeping matter.

19         THE COURT:  All right.  Thank you.  I'll accept those

20  in evidence for the bond hearing only.

21         MR. LIGHT:  Thank you.  Now, with regard to the

22  argument about aiding and abetting, about what the words on

23  the video mean in regard to the aiding and abetting charge here,

24  if there was an argument, it was only about the timing.

25      Mr. Tanios cannot escape his words:  "Not yet, not yet.

It's early."  There's no other reasonable interpretation of what that means.  With all due respect to Ms. Gross's argument about wanting to use it later in the case of some sort of an attack, this has to be viewed in the context of what they just saw and what happens minutes later.

What they just saw, as we reviewed on the video last time we were before the Court, is that both Mr. Khater and Mr. Tanios were witnessing the onset of violence.  They were witnessing law enforcement officers engaging with rioters in a violent fashion, throwing things back and forth, tussling.  It was happening right in front of them, and you see that right on the video.

Now, the words that Mr. Tanios uses undercut any other interpretation that he tries to give to the other words caught on camera.  Mr. Tanios does not want Mr. Khater to be a lone wolf reacting in the heat of the moment.  Remember the words we hear: "He just f'ing sprayed me."

The idea that he's doing anything to halt the violence or distance himself from it or to talk Mr. Khater out of it is somewhat of a fantasy here because he's not trying to stop the violence; he's filming it.  And what I'd like to do, if Your Honor would allow me, is bring up one clip from Exhibit 4.

THE COURT:  If it's already in evidence, yes.

MR. LIGHT:  So allow me a moment while I share my screen.  Court's indulgence.

Okay.  Can everyone see my shared screen?

1          THE COURT:  Yes.

2          MR. LIGHT:  I apologize for the delay there.  So

3    we've cued it up on Government's Exhibit 4 at the 2:21:59

4    timestamp.  This is approximately a minute before the assault

5    on this line of officers that I'm highlighting over here to

6    the right on the lower west terrace begins.  As you recall,

7    Mr. Tanios is delineated by this orange arrow here, and

8    Mr. Khater is delineated by this red arrow here.

9          Now I can -- rather than watch the entire video, I can

10   proffer to the Court for the evidence that is before it that

11   for the previous 10 minutes, Mr. Tanios and Mr. Khater are

12   standing in this area right here talking to each other.  They're

13   talking.  This is when the interchange that's caught on Exhibit

14   5, the Convo Couch, occurs.

15         They're talking with people standing around them.

16   They're engaged in conversation, and Mr. Tanios is sitting

17   there.  We believe he's holding a phone in his hand from the

18   earlier video, but we don't see anything in his hand until --

19   and I'm going to play this for about 30 seconds until this

20   moment in the clip.

21         So I'm pressing play on Government's Exhibit 4.

22         Mr. Khater is moving closer to the front line, closer to

23   the officers.  And keep an eye on Mr. Tanios here.  There at

24   the 2:22:20 mark, you can see Mr. Tanios -- and hopefully the

25   Court can see it -- has just raised his hand.  For the first

time in approximately 10 minutes, Mr. Tanios starts filming.
This is 40 seconds before the assault on the line begins.
And his hand stays up, filming the entire time, until the crowd
starts moving back because of the spray that is being pushed on
the people that are assaulting the line.

So the only point to make here, and I'll stop that share
for now, is that Mr. Tanios did not do anything after witnessing
the violence other than continue to observe and continue to
film.  He raises his hand to film this because he knows what's
coming.  Everyone knows what's coming on that line because it's
already happening.

The mob is trying to break through this line.  They're
doing this -- hundreds and hundreds of them are doing this all
around the Capitol, but specifically in this area of the lower
west terrace, in concerted and synchronized action.  That is as
much a part of this as the aiding and abetting.

There's a conspiracy charge here in terms of the conspiracy
to injure federal officers.  And one can join a conspiracy in
a very short amount of time, and that's what's happening here.
He provided that bear spray.  He told him to wait: "Not yet, not
yet.  It's early."  And then, as all the video evidence shows,
they waited together until the right moment, and that's when
Mr. Khater launched his attack.

And, Your Honor, after all this was done, in other
documents that are before the Court -- I direct the Court to

the statement of facts in support of the criminal complaint,
specifically page 7, figure 6 -- Mr. Tanios posts a picture
on social media of himself posing at the Capitol after the
violence has subsided and the breach has been under control.
I can show that to the Court right now, but that is in evidence.

So Mr. Tanios makes arguments about the lack of his own
direct violence.  That's obvious.  He doesn't actually spray
anybody with his own hands.  He uses someone else's hands
because he's the supplier of the weapon in this case.  He's
coaching Mr. Khater on the timing so that he's not some lone
wolf attacking the line.

And by this aiding and abetting on the assault, Mr. Tanios
is liable for the actions of the principal and can be held
responsible in the same fashion as the principal.  Your Honor,
that's elementary criminal law, and the doctrine also applies to
this Court's determination of dangerousness.

By enabling these actions, he's just as dangerous as
the principal.  And it shows the same lack of respect for law
enforcement, the lack of respect for the authority and the rule
of law, and establishes that he presents a clear danger to the
community.

THE COURT:  All right.  Thank you.

Let's turn to Mr. Khater at this time, if we can.

Mr. Tacopina.

MR. TACOPINA:  Yes, Your Honor.  Just very briefly,

I just wanted to -- listening to everything in the last 35 to 40 minutes or so, I just want remind everyone we're at a bail haring right now.  We're not at the trial stage, and certainly this is not to determine guilt or innocence.

There are a few things I didn't -- I'm not going to go through everything I said last time, Your Honor.  You heard my argument at length regarding *Munchel* and how I think we distinguish *Chrestman* and some of the factors that come into play here including the --

THE COURT:  There is a new case that's just come down.  Counsel may not have seen it yet.  May 5th.  So it's a recent.  *United States v. Worrell*.  It was unfortunately an unpublished opinion by the D.C. Circuit.  It is case 21-3020, D.C. Circuit, May 5, per curium.  Judge Wilkins was on the panel and was the author.  He's the one that wrote *Munchel*.

That case has affirmed Chief Judge Howell where the defendant was found to fit in the category of offense carved out by *Munchel* to pose a danger to the community primarily because of the efforts he took to assault police officers with a pepper gel spray and discharged the pepper gel spray at a thin line of police officers at a location where the mob was ultimately able to break into the Capitol.  That's at pages 41 to 42.

So it looks more like a categorical type of approach, as opposed to the approach that Judge Bates had taken in *Klein*.  In any event, let me get to your argument on Mr. Khater's

situation.  As I've said, he has a lot of support from his
family and the bond support you've indicated for the monetary
bond.

MR. TACOPINA:  And we're, again, in agreement to a
house-arrest, home-detention situation, Your Honor, which makes
this really -- it should make it a relatively elementary
decision for the Court.  But with full respect, let me just go
through my points.  And we haven't seen that case.  Mr. Siegel,
my partner, I see is on the computer taking a look at it right
now, and I'll ask him to jump in if there's anything that, Chad,
that you think --

THE COURT:  It just came out, so it's unpublished.

MR. TACOPINA:  Yeah.  The one thing I was remiss at,
I didn't mention last time, again because we were on the clock a
little bit and we were trying to get everyone in and Ms. Gross
needed some time as well, was that Mr. Khater is in this
predicament where he's in lockdown 23 hours a day.

It's incredibly difficult for him to communicate with
anyone, including counsel.  We've not been able to speak to him.
You know, the conditions are horrible.  There was actually --
in our brief on page 19, our initial submission, there was --
our memorandum in support of his pretrial release, we cited an
article from WaPo, from *The Washington Post*, where it talked
about -- the headline of the article was "End of Coronavirus
Lockdown in D.C. Jail."

And it talked about these incredibly draconian conditions in the D.C. jail where it's been on lockdown, you know, 23 hours a day.  Inmates are in their cells for 23 hours a day.  They're not permitted to see family or friends.  Contacts with attorneys are very sparse.  I could tell you we've not been able to reach him since the last hearing.  That's how difficult this has been. We tried to get him before today's hearing in the last week and couldn't do it.

You know, I mean, there's an article that talks about the conditions there that have given rise to violence, to mental health problems, and -- you know, there's a whole host of issues, and there was an article again that we cited in our papers.  But I don't think any pretrial detention, let alone under these onerous conditions for however long the pendency of this case may last, is necessary to reasonably assure the safety of the community and Mr. Khater's return to court.

You know, again, Ms. Gross argues the point regarding Mr. Tanios's statement about buying the chemical spray for his own defense, presented a witness that sort of supported that theory.  We obviously adopt that.  There was a conversation that we had with the government in the last hearing about this plume of smoke on Government Exhibit 3 in the video at 2:11:05.  That was tear gas deployed by the police.

The government, at that last hearing, argued that it was deployed by the crowd.  In fact, that was deployed by the

police, that plume of smoke that we see at 2:11.  And it's at
that point where Khater was subject to what he said out loud,
which is they just sprayed me, or they just f'ing sprayed me.
That's a truthful assertion made sort of contemporaneous at the
time when he had no reason to believe his statement was being
recorded or would ever be played in a courtroom setting later
down the road.

So, again, he clearly sounds upset when he's saying it.
There's the smoke.  You see it.  It supports the alleged conduct
being a reaction and not a coordinated conduct, and that's what
this was.  Again, we saw the big spray gun where the mace was --

THE COURT:  Wasn't there at least nine minutes between
the point that he obtained the spray and he then used it?

MR. TACOPINA:  It was after he was sprayed, Your
Honor, that he used it.  There was -- twice he was sprayed,
don't forget.  There was that plume of smoke, and then we showed
the video where the officer in the direction where Mr. Khater is
used that soaker gun, or whatever they called it, to spray this
large amount of chemical spray into the crowd, I mean, just
haphazardly into the crowd.

The bottom line is he never coordinated an attack.
He never accessed the Capitol.  He never intended to access
the Capitol.  He never used the bear spray.  He used a spray
that was not -- again, we talked about this -- the fact that
it was in *Munchel*, which at least up until 10 minutes ago was

the case we were sort of embracing, and *Chrestman*.  And I think
they support release.

He doesn't pose a threat of danger in the future, which is
the relevant consideration.  There's no real evidence of prior
planning.  An unrecorded 39-second call, you know, two days
before, three days before, and a 21-second call during it with
no substance to that call at all, and the surrounding evidence
show that there was no plan executed, Your Honor.  It was not a
plan.  It was a reaction.

And, you know, again, there was no dangerous weapon
carried.  This was mace.  It was not bear spray.  It was not
some illegal weapon.  And, again, he didn't coordinate with
other protesters.  I think that was said already; I don't want
to be repetitive.  But he was not part of a violent group.  He
was not part of the Proud Boys.  He didn't breach the Capitol.
He didn't do any of the things that one would expect that this
was a coordinated, planned attack.

He didn't play a leadership role at all on the events of
January 6th.  There's no question about that.  The government's
not arguing that.  Again, all of these arguments we made, he
just does not pose a risk of future danger sufficient enough
to warrant his remand during this case.

The guidelines in this case, Your Honor, are such that he
has zero incentive to flee.  So, I mean, there's so many reasons
-- plus we are submitting what I think is an enormous bail

1    package, well in excess of what we need to present, but we want

2    to be sure.  We have 16 people who are putting their financial

3    lives on the line if the Court thinks it's necessary.  We're

4    guaranteeing a $15 million bond secured by five properties.

5    You know, he's willing to submit to house arrest, the bracelet.

6    There's zero risk of flight here and zero danger to the

7    community at this point.

8         The last that I'll point out, and I said it last time and

9    -- I mean, Your Honor just mentioned a case, and I don't know if

10   Mr. Seigel is looking it up to read it or distinguish it at all

11   at this point, but in our brief starting at page -- I think it's

12   20 -- I'm not going to read them all again; there are a slew of

13   cases in this district where people who are charged with the

14   exact same crimes, except much more violent crimes, like hitting

15   an officer with a wooden plank, literally with a wooden plank,

16   were released on bail.

17        I listed them all.  I'm not going to repeat them.  It's

18   the things that I said last time.  But there are acts here and

19   actors here who have done things way more violent than a

20   defensive spray of something that's legal in this instance and

21   were released on unsecured bond, let alone a bond worth 15 million

22   and house arrest and, you know, a dozen and a half signatories

23   and everything else.

24        So I just think, Your Honor, we presented a bail package

25   that's so overwhelming that I think the only thing that is

1    appropriate here would be some sort of conditions of bail and
2    not pretrial detention.
3         Can I ask just, Your Honor, Mr. Seigel, I don't know --
4    Chad, have you been able to take a look at that case?
5              MR. SEIGEL:  I have, and I actually just sent you
6    a message on it.
7         Your Honor, it appears that in the *Worrell* case, the
8    defendant was, and I'm quoting here, "an unapologetic member
9    of the Proud Boys gang who actually assembled with a larger
10   group of Proud Boys members that day."
11        So, in that instance, there was clear and convincing
12   evidence of a coordinated attack, in contrast to what we have
13   here.  The evidence here is by no means clear and convincing,
14   which is what the standard is, but I'll also add that in
15   contrast to Mr. Khater here, the defendant in the *Worrell* case
16   had a number of prior convictions.  Mr. Khater clearly has an
17   unblemished history.
18        So all that factors in under the *Chrestman* factors in
19   favor of release, particularly under onerous conditions that
20   Mr. Tacopina outlines, which would be home detention.  There's
21   no risk of any future danger and certainly not one that couldn't
22   be appropriately mitigated by the substantial bail package in
23   place.
24             MR. TACOPINA:  So I think, Your Honor, we've
25   distinguished *Worrell* pretty substantially just now in about

1   a minute and a half.

2              THE COURT:  I appreciate that.  Thank you.

3        All right.  Mr. Light?

4              MR. LIGHT:  Yes, Your Honor.  And I'll just briefly

5   make a couple of points.  With regard -- I would point the

6   Court towards the *Fairlamb* decision which I think you referenced

7   for us at the last hearing, but Judge Lamberth wrote in that

8   opinion, which is at 2021 WL 1614821, and this is at page 5:

9        "If any crime establishes danger to the community and a

10   disregard for the rule of law, assaulting a riot-gear-clad

11   police officer does."

12       And, Your Honor, in this case this is even more dangerous

13   to a certain degree because these officers, these three officers

14   who are the victims of this crime, had no such protections.

15   They had no riot helmets.  They had no protective eyewear.

16   Two of the three had some bicycle helmets on.  They had no face

17   shields, protective vests, no heavy jackets.  They were exposed

18   and defenseless when Mr. Khater sprayed them all directly in

19   the eyes.  This establishes dangerousness on its own.

20       *Fairlamb* also cites to *Munchel.*  And I'm not going to

21   rehash the *Chrestman* factors, we've gone over them, but the

22   analysis under *Chrestman* with regard to that dangerousness and

23   the disrespect for authority and the attack on law enforcement

24   officers, it overcomes the lack of a criminal history really

25   for both defendants here.  And that is how the Court should be

1    evaluating the dangerousness of these two individuals.  I just

2    take issue with one point that Mr. Tacopina stated earlier.

3        First of all, this is not a defensive spraying.  You can

4    see on the video that Mr. Khater sprays one, then two, then

5    three officers.  And after those three officers, he continues

6    spraying on for, you know, 10 to 15, maybe 20 seconds, until

7    Lieutenant Bagshaw sees him continuing to spray, well after

8    the assaults that we've specifically charged here, against those

9    three officers, and only then does he run backwards and gets

10   sprayed by Lieutenant Bagshaw with what we refer to as that

11   Super Soaker sprayer.  So this is not a defensive action.  This

12   is not a heat of passion.  He had, as Your Honor noted, nine

13   minutes to cool down from what had happened before.

14       And the suggestion, secondly and finally, that Mr. Khater

15   was sprayed by Lieutenant Bagshaw or other police spray in the

16   moments before he attacked these officers is not borne out by

17   the video.  If you look closely at the sequence starting at

18   2:23:00 on that video, Mr. Khater shows no reaction whatsoever

19   in the seconds before he is sprayed.

20       You don't see him flinching.  You don't see a reaction.

21   You don't see any emotion.  He's staring straight ahead with his

22   hand up in the air.  He's not standing there peacefully and then

23   gets hit and then springs into action.  His hand is already up

24   and it stays up.  So the idea that he gets hit first is kind of

25   wishful thinking, because the video speaks for itself.  It

shows, Your Honor, all you need to know about this crime and
supports detention for both defendants in this case.

And I can address anything else Your Honor would like me
to at this point, but at this point the government will rest on
its submission.

THE COURT:  All right.  Thank you.

All right.  The Court has before it the applications for
the bond and has heard substantial evidence over the past two
hearings, the first one and this one, and has reviewed, as it
said earlier, all the records in the case that have been
presented to it.

Mr. Khater requests release conditions including a
$15 million bond -- it's actually a $1.5 million bond secured
by him to get the $15 million -- home detention with electronic
monitoring conditions, and surrendering his passports.

He indicates he has no prior record and has over, as I
said, 19 letters apparently, 18 or 19, as I recall, letters
from family members indicating his reputation for nonviolence,
including most all the letters said he would never step on a
bug or squash a bug or hurt a fly.

Mr. Tanios requests release to his home in Morgantown,
West Virginia, under a combination of standard and additional
special conditions including home detention, electronic
monitoring, 24-hour video surveillance.  He has a business
he needs to run.  He has family responsibility, children to

1   support, all of which could be affected by his continued

2   incarceration.

3       The Court really has before it, as the other judges in

4   our court, to face a unique situation in these cases.  We have

5   approximately 300 complaints, warrants, or informations and

6   indictments at this point, and we expect to get another hundred

7   or more.  The judges have struggled with the bond requirements

8   because of the information that has been produced in court by

9   the government.

10      And I agree with Mr. Tacopina that not all has been

11  consistent in the government's positions.  They have agreed to

12  have some released who could be considered violent offenders,

13  did not oppose their release.  That's the government's rationale

14  for whatever it is, and I think each case has to stand on its

15  own.

16      It's an unusual situation that there have been two Court

17  of Appeals opinions on bond, which is very rare, out of this

18  group already, and I suspect there will be more.  The Chief

19  Judge of our court, who has had the most activity in the bond

20  reviews because of her position, has written extensively, was

21  reversed in *Munchel* and has continued and now in the *Worrell*

22  case.

23      Other judges have issued extensive, long written opinions

24  discussing the issues, and it's hard to find consistency except

25  perhaps where there is violence concerned against the police

1    officers where the government has moved for detention.

2        There is some pattern of activity you can see from the

3    *Munchel* opinion on violence in a different category than

4    others.  I have considered some individuals.  I've released

5    most individuals, even one that was in the Capitol with a weapon

6    that he never unsheathed or used.  He committed no violence.

7        So we have to consider what we've got before us here, and

8    I'm going to make a record so the parties can consider what

9    I've looked at as well as for either side to review as they

10   take necessary and further steps.  I have worked out a detailed

11   timeline again, as we've been discussing, because I think the

12   timeline is important in the case.  And I'll first just review

13   -- it's a factual determination by the Court.  It's based upon

14   facts as well as the law.

15       We have a timeline that the defendants first appear around

16   2:09 p.m. on videos that I've been shown.  And the police spray

17   the crowd.  Whether this is the first smoke that appears is back

18   behind these individuals, the government and defense have a

19   different interpretation of what the smoke is, but in any event,

20   on 2:11:15, we're going to 10ths of a second on this, police

21   spray the crowd with a Super Soaker and again at 2:23:05, and

22   again at 2:23:26 when Detective Bagshaw sprays Mr. Khater

23   following his assault.

24       The first two, it does not appear Mr. Khater's in line to

25   get sprayed.  They do not appear close to Mr. Khater when you

examine closely the videos and understand the positions where they're taken from, as well as Mr. Khater doesn't have any effects at all that you can see except he mentioned that he was "f'ing sprayed."

The assaults that he committed were at 2:23:10 and 2:23:21, some seconds apart from each other, that they continued on. It was not just a snap thing where he sprayed once and then ran.  The time he said that he was sprayed, the "f'ing sprayed me" was at 2:14:10, and that's nine minutes before he went up and sprayed someone.  It was not an immediate reaction beyond his control.

It looks like he took the bear spray out and may have gotten the other spray at some point around 2:14:30.  We see this large bear spray in his hands, which he never used. There's little evidence exactly when he got the mace.  He obviously was going through Mr. Tanios's backpack so far away you can't exactly tell what he did, but he could have gotten it during that time frame of the conversation at 2:14 when he was talking with him.

Then as to Mr. Khater, once he starts spraying the officers, he sprays -- about 2:23:08, he sprays Officer Sicknick.  That's the officer that died the next day.  There's no allegation in these pleadings that he caused that death.  But he didn't spray Officer Edwards, the female officer, standing there with no gear protecting her face, etc., standing right in front of him, until

2:23:12, some four seconds later.  And when you review the video, you'll see he stepped forward to the front of the line again and extended his arm directly at her face and sprayed her directly, which caused her injuries according to the proffer.

Mr. Tanios, as to the time frame, ties in with Mr. Khater as the government just showed in the one where he was discussing matters with Mr. Khater, and eventually Mr. Khater got whatever he got from him to use as a spray and then apparently begins to film what's going on as they attack the front line of the police.  "They," other people in the crowd.

Importantly, counsel for Mr. Tanios insists that he says "nah," and "don't do it" at the point in the conversation after the earlier things where he says it's too early, et cetera. Substantial reviews by myself and many others have not been able to hear that.  So after the spray goes on, they join up and apparently leave the area, although Mr. Khater does a second spray in general of the police officers, and he's sprayed by Officer Bagshaw.

I always start with a premise that bond should be allowed in most cases, in almost all cases, under the Bail Reform Act. And cash bonds are to be discouraged, because cash bonds operate as a bar to poor people, to minorities, getting out of jail, and I think they should not be used to hold people.  As to wealthy people who can afford large cash bonds, that again operates against those who can't.

1    But let me go through the particulars here in this case.

2    I'm going to -- as I said, I reviewed the timeline in my

3    dictated opinion.  I'll do the same a little bit more, and I'll

4    consider the defendants posing a danger to the community if

5    released and whether the government has shown that by clear and

6    convincing evidence.  I'm going to deny the request of both

7    cases for bond to both defendants.  I'm going to do it for the

8    following:

9        I'd already indicated when they arrived about 2 p.m.,

10   away from the police barricades at the lower west terrace of

11   the Capitol, Mr. Khater is seen rummaging through Mr. Tanios's

12   backpack.  And at about 2:14, as I said, they are captured on

13   camera.  Mr. Khater has strayed towards the police line, returns

14   back to Mr. Tanios, and Mr. Khater says, "Give me that bear

15   shit."  That's clear.  This is nine minutes before he goes up

16   and claims he's been sprayed again.

17       Mr. Khater tells Mr. Tanios that, inaudible, "f'ing sprayed

18   me."  "They" or something sprayed me, or police.  We aren't

19   sure.  Mr. Tanios turns his head around to Mr. Khater and says,

20   "Hold on.  Hold on.  Not yet, not yet, not yet.  It's still

21   early," before the conversation becomes inaudible, and

22   regretfully I cannot hear counsel's representations what is

23   said thereafter.

24       Mr. Khater I think at that point again repeats that "they

25   f'ing sprayed me."  But you don't see, if you watch the video

closely and in slow motion if you go to it, him reacting in any
way to being sprayed.  He's not rubbing his eyes.  He's somehow
able to talk.  He's not bent over as you see the officers who
he sprays are affected.  And at that point, you see him holding
a spray canister.

About 2:20, Mr. Khater leaves Mr. Tanios and goes to the
bike-rack barriers.  He's there for a bit.  And then at 2:23 --
about nine minutes later, Officer Bagshaw sprayed the crowd
again with the Super Soaker.  If you take a slow-motion review
of that, Mr. Khater is not close to being hit by that spray.

Seconds later, he approaches the front of the police
barricade and is waving his arm back and forth in an arc-like
swing of spray, small handheld canister apparently like mace,
he sprays Officers Sicknick, Chapman, and then a few seconds
pass and Officer Edwards directly in her face at a point-blank
range, not eight feet away.

At 2:23 he is seen spraying a different group of officers.
He keeps spraying, holding a barricade, and that is when you'll
see the assault, and the breakthrough of the crowd begins on the
bike racks.

As I reviewed the time frames, this happened crucially
around 2:23, probably starting in Exhibit 4, 2:23:05 to 2:23:12,
and then Exhibit 6, 2:23:05 to 2:23:08, and you slow down and
you can see 2:23:09, these are mere seconds apart.  2:23:10 you
can see Mr. Khater and his arm follow through and spraying

Sicknick and Chapman, and then at 2:23:12 he swings back again, and Edwards is sprayed about that time.  At 2:23:13, you see Officer Edwards take cover.  She's blinded by the attack.

At 2:23:21, it appears Mr. Khater sprays again a second group of officers, and that's when he's sprayed by Bagshaw, and you'll see at 2:42 there's a call to Tanios made.

All right.  With those facts, what do I find?  I also find as a matter of fact that the government has shown that Mr. Tanios purchased these various sprays at the gun type of store after an apparent a conversation with Mr. Khater the day before, and defense found the witness who testified that he did so, he says, to protect himself from attack, but took them with him.

The argument that everything they had was legal is a red herring; that is, you can take a pocket knife that's legal, but if you attack a police officer with it, unprovoked, it's an illegal attack.  It doesn't make any difference if whatever he had was legal when you review it.

So where do we go with that, the conclusions that I made of the facts that the facts show?  Much of the argument to the Court -- and I think, actually, Mr. Tacopina may have hit on this a little bit -- was really closing argument to a jury as to what the facts that they read and how they could be concluded. And Ms. Gross may have a very good closing argument to the jury that could sway the jury.  That is not where we are at this

time.  I have to look at the facts as I can best determine them and as I give my conclusion.

What is the legal standard I apply with these standards? Obviously, it's a *de novo* review of the magistrate judge's ruling in Mr. Tanios's case.  Mr. Khater waived a bond hearing at that point, and so this is his first hearing.

Under the Bail Reform Act, a person is encouraged to be released awaiting trial on federal offenses -- here we have nine felonies, I believe, and one non-felony, 10 counts -- on personal recognizance or bond conditions of release, or being detained.  That's 18 U.S.C., and these will all be at 3141 and on.

Now, obviously, when this is the type of charges that are enumerated, I have to hold a hearing on whether the defendant poses a serious risk of flight, which I'm not finding at all in either case, or attempting to obstruct justice or threat to injure or intimidate a witness or juror or be a danger to the public.

One of the cases we'll review is the *Chrestman* case by Judge Howell.  Here the defendant's charged with a crime of violence, as the defendants are in this case in the various counts.  And in these type of counts, the courts have held the defendant charged under these charges is a crime of violence. I think every circuit that's considered it says that.

So that if the defendant should be held under 3142(f),

1   I have to -- shall detain him unless I determine there's no

2   condition or combination of conditions to reasonably assure

3   the appearance of the person as required and the safety of

4   any other person and the community.  And the burden is on

5   the government by clear and convincing evidence as to the

6   latter part of that.

7       I'll obviously review the factors I have to review: the

8   nature and circumstances of the offenses, crime of violence or

9   not, the weight of the evidence, the history and characteristics

10  of the person -- which we have here.  We have a lot of history

11  of these individuals.  It's all good history.  There are no

12  prior offenses.  No felony offenses at all.  They have ties to

13  the community.  They have financial resources.  They have family

14  and family ties.  They have full employment.  They're not on

15  probation or parole for any prior offenses -- and the nature

16  and seriousness of the danger to any person in the community

17  that would be posed by the person's release.  3142(g)(4).

18      One of the issues originally before the magistrate judge,

19  as to clear it up in this court and make sure the parties

20  understand it, in our circuit you can proceed by proffer, both

21  the government and defense.  *United States v. Smith*.  That's

22  about a 30-year-old case.  79 F.3d 1208, a 1996 case.

23      So first let's find whether or not defendants pose a danger

24  to the community or other persons and a particular threat posed

25  by these individuals to the community.

1           Now, our guideline, obviously, is the *Munchel* case,

2     991 F.3d.  That was a case involving a riot-charged individual.

3     So look at *Munchel*.  And there's been a big argument about that,

4     but the D.C. Circuit says, and it really instructs us, quote,

5     "Those who actually assaulted police officers and" -- they have

6     an *"and"* -- "broke through windows, doors, and barricades, and

7     those who also aided, conspired with, planned, or coordinated

8     such actions are in a different category of dangerousness than

9     those who cheered on the violence or entered the Capitol after

10    others cleared the way."  That's 991 F.3d at 1284.

11          *Munchel* sets forth a categorical approach.  It's

12    interesting.  And he had been questioned by Judge Bates in his

13    earlier opinion somewhat as to how *Munchel* advises the Court

14    to proceed.  But it seems to me now with *Worrell,* it pretty

15    well has -- and by the same judge who wrote the *Munchel* opinion

16    in the *Worrell* opinion -- pretty well approaches the issue by

17    splitting rioters into two buckets.

18          One, if you look at it actively, violently, and then the

19    others are merely complicit, take no active action except wander

20    through the Capitol once it's open and the police have been

21    defeated.  The Court explicitly in *Munchel* delineates an

22    elevated category of dangerousness applied those that fall into

23    the category that necessarily impose a concrete prospective

24    threat.

25          Judge Lamberth, I think as the government said in *Fairlamb*,

laid that out fairly well.  Quote: "*Munchel* drew categorical

distinctions to divide nonviolent January 6th dissidents,

explaining the former category are more dangerous." *United*

*States v. Fairlamb.*  That's 221 WL 1614821 at 5, April 26th

of this year.

So if you take *Munchel* and *Worrell* and look at the addition

by *Fairlamb,* if a rioter in the elevated category presents a per

se concrete and prospective threat, I mean we have to decide

whether the defendant is too dangerous based upon that conduct

to be released or is not.

I think *Munchel* does not set a hard-line rule.  I don't

think that the categories are solely determinative, but it

creates something like a guideline for the Court to follow

so that someone that's a violent defendant is presumed to pose

a concrete and prospective threat, and a nonviolent defendant's

presumed not to pose such a threat.  But every circumstance

is different in every case, and you have to look at individual

cases.

And you have to find what the ultimate conclusion would

be, that the government may well not overcome the concrete and

clear and convincing evidence requirement, which I've found in

other cases.  But I don't know how else to treat the D.C.

Circuit's explicit categorizations now in both these cases

they've decided: those individuals who pose a threat because

they attacked police officers without cause, while ensuring the

1    defendants have an individualized assessment of any future

2    threats.

3         So using that approach, courts have decided defendants

4    who should be detained pending trial, as I referred to *Worrell,*

5    is similar, although there are factual differences as according

6    to the distinctions by Mr. Khater's counsel that *Worrell*,

7    however, used a categorical approach, and they found someone

8    that's a danger to the community can't be released because of

9    efforts to threaten and injure police officers with the pepper

10   gel spray.

11        He discharged a pepper gel spray at a thin line of officers

12   where the mob was able to break through.  He had other issues,

13   belonging to a radical right-ring violent group, apparently, as

14   well as having a record, but the essentials of what he did in

15   this case are those, which is similar to here.

16        I think you'll see an analysis in many of the cases by the

17   judges that I've looked at where the efforts by the defendants,

18   having them detained because not only did they assault the

19   police officer, they assisted in the breaching of the police

20   officer line, they assisted in the -- facilitated the ultimate

21   breach of the Capitol.  And that's a concern.

22        Judge Lamberth did that in the *Fairlamb* case where he

23   said the officer was shoved, punched, and the defendant

24   employed violence, unlike others who obstructed Congress with

25   their presence.  This one used violence to obstruct Congress.

He targeted police officers who were struggling to control
the Capitol, and it contributed to the chaos on Capitol Hill.

In *Padilla*, Judge Bates, he had written an earlier
opinion sort of distinguishing *Munchel* that thought there
were gradations and various levels you should consider, and
released the gentleman.  In *Padilla* he found that the defendant
committed three separate assaults on police officers, including
throwing a pole, fits squarely into the category of dangerousness
articulated by *Munchel,* and that's at 221 Westlaw 1751054 at
page 9, May 4, 2021.

He still did not adopt a pure categorical approach
articulated by *Fairlamb* and *Worrell* but found that the
defendant's violent acts, coupled with his comments signalling
that there could be more violence, provide clear and convincing
evidence he posed a concrete prospective threat to public safety.

And finally, we do have to put this in context.  We have
to realize what happened that day and what was going on.  It
wasn't just Mr. Khater on his own, by himself, feeling the
police had mistreated him, pulling out a can of spray and
retaliating by himself and there was no crowd around, nothing
happening.  That's just not what we have.

The D.C. Circuit observed: "It could not be gainsaid that
the violent breach of the Capitol on January 6th was a grave
danger to our democracy, and those who participated could
rightly be subject to detention to safeguard the community."

1   1284 to 1285 in *Munchel*.

2        So with those factors and background and the facts as

3   I found them reviewing the videos carefully, and considering

4   counsel's arguments as to Mr. -- and I'll get to Mr. Tanios

5   in a minute further as to his situation, but I'll go through

6   the Bail Reform Act factors for the record.

7        First, the nature and circumstances of the offense.  I'm

8   going to use the *Chrestman* factors as suggested by Chief Judge

9   Howell to assess -- it's sort of a guidepost to assess the

10  comparative culpability of a given defendant in relation to

11  fellow rioters.

12       Other judges have done the same.  Judge Sullivan, Judge

13  Bates, Judge Lamberth and others have used the *Chrestman* factors

14  in a case called *Whitton*, 221 Westlaw 1546931 at 7; *Sabol*, 221

15  Westlaw 145945 at 27; and *Klein*, that's Bates, at 2021 Westlaw

16  1377128 at 7; and *Padilla*, which I've given the cite to earlier,

17  I believe.  So we have to look whether defendants have been

18  charged with felonies, which they have been.

19       Engaged in prior planning.  We'll talk about that.

20       Carried or used a dangerous weapon.  That's something that

21  could be considered to be a dangerous weapon.

22       Coordinated with anyone else before, during, or after the

23  riot.

24       Assumed a formal de facto leadership role and encouraging

25  other rioters in this conduct.

And the nature of defendant's words and movements during the riot, whether he confronted federal officers or otherwise similar efforts to disrupt the certification of the electoral count.

So the offenses, it's undisputed we have multiple felonies here, nine serious felonies.  Those are the greatest number, actually, and more serious charges I have seen in my various riot cases.  That weighs to relative culpability and detention.

The prior planning and coordination.  The government has two theories, somewhat challengeable, I think.  First, Mr. Tanios and Mr. Khater planned and coordinated with each other to assault law enforcement officers, and secondly, timed their assault to accompany the nearby breach of the bike racks, assisting the rioters in their breach.

There was obviously some prior planning and coordination, that is, the defendants talked on the phone and bought these devices, legal devices, which Defendant Tanios has presented evidence that they bought them to protect themselves from attacks that may have occurred but obviously could be used otherwise, that they brought them with them to the city.

Mr. Tanios, obviously, aided and coordinated with Mr. Khater, first in bringing these materials down that could be used, and then in the assault of the police officers despite his counsel's ardent advocacy that their words could be interpreted differently and there were other words that we could not hear

that occurred to show that he was saying "don't do it."  The words, the way I hear it, and the actions he took seem very clear that he allowed Mr. Khater to take away the bear spray, whatever happened to that, and to obtain the mace that he did use and which Mr. Tanios is apparently trying to film when he used it.

I think, under *Munchel*, working with one another is sufficient where he coordinated -- Mr. Tanios coordinated with Mr. Khater to assault the law enforcement officers, and I think the evidence supports that allegation.  There's arguments against that; but at this point it's apparent to the Court that Mr. Tanios did cooperate with him and did assist him in being able to attack the police officers, and that puts him in the elevated category of dangerousness.

There's no question that Mr. Tanios brought the weapons along or the products to be used as weapons in direct contact with Mr. Khater beforehand.  And he brought, obviously, the bear spray, which has a very long reach, which was not used.  They came together.  He had to drive from New Jersey to Morgantown, West Virginia, Mr. Khater there to pick up Mr. Tanios, and they drove back and stayed together in D.C.

I think that obviously Mr. Tanios and his counsel submitted evidence that he bought these devices to defend himself against attacks, should there be attacks by other people if he felt threatened.  That is somewhat inconsistent with expecting a

peaceful political rally; but however he asserts that, other
rallies have been attacked.

I considered the testimony of Sean Ruth for Mr. Tanios,
a veteran.  He testified at the hearing.  There was no prior
planning.  He was going to go with him.  That doesn't mean he
didn't discuss with Mr. Khater what they wanted to do to protect
themselves if attacked or could -- would then make the equipment
available to use against the police.

But I think you can find, if you look at the evidence
closely the day that this happened of the riot, there's no
question they were talking with each other.  They stood there
for several minutes and talked when they first got there.  They
watched the crowd get more and more excited and begin to attack
the police and push against the fence.

They communicated on their cell phones as the riot began,
and then Mr. Khater took the materials that he used eventually,
the shared backpack carried by Mr. Tanios, got the pepper spray
which was used to assault the officers.  Mr. Khater originally
asked for the bear spray, which was much more powerful, and it's
clear that Mr. Tanios said, "Hold on, hold on.  Not yet.  It's
still too early.  It's still early."

So, obviously, that indicates the understanding they were
going to use this product.  It wasn't just out of the blue.
They obviously had some intention to use the product that they
understood, either through their conversation earlier, that this

is what they were going to do.  It seems that it was definitely planned at that point.  The only targets that they were worried about attack by applying the bear spray or the mace were the police.  It wasn't going to attack the other rioters to stop them.

Now, the timeline supports the inclusion of the defendants' time the chemical -- the dispersal of this chemical substance to coincide with the other rioters' efforts to forcibly move the bike-rack barriers preventing the rioters from being closer to the Capitol building and trying to breach the Capitol Building. In other words, they played a role in the ultimate breach in the attack of the Capitol.

Next to where the Defendant Khater sprayed, you can see the rioters breach, at that very close time frame, the police line there.  The spray disabled at least three officers.  It disabled others who had to care for those officers and left holes for their protection.

And as to the injuries to the officers, we have the representation of the woman's injuries in the record as to blisters, et cetera, in her eyes.  And you could see right afterwards in the video she was blinded.

If you look at Officer Sicknick, who is in the videos for a while, he has about 10 or 15 minutes of video where he's back up on another level of the Capitol, sort of dazed, wandering around.  He's ineffective.  He can't do anything.  He is injured.

1   Officer Chapman I don't know about, but it's clear to me
2   that he was violently assaulted and hurt, as well as Officer
3   Edwards, by Mr. Khater.
4       The timing of the attack really coincides with the other
5   rioters next to him, or very near him, pushing up against the
6   bike racks that prevented them from moving further on.  I think
7   that is a direct connection that they have.  I don't think
8   they're the direct proximate cause of the breach of the line
9   all up and down, but they certainly contributed to the crowd's
10  ability to breach the police line at that point.
11      So that assault -- and I think Mr. Tanios is engaged in it
12  as an aider and abettor -- committed an assault which helped
13  lead to the violent breach of the Capitol, and that indicates
14  a finding of dangerousness if you look at *Fairlamb*'s analysis.
15  The conduct contributed to the chaos on Capitol Hill.
16      *Chrestman* says the defendant sought to succeed in causing
17  mayhem on Capitol grounds, interfering with the police, which
18  meant concerted, deliberate efforts to undermine law enforcement,
19  and that weighs heavily under detention.
20      Mr. Khater did the spraying.  Mr. Tanios did not, but he
21  obviously worked with him on that despite counsel's arguments.
22  There's no question that the same charges pending against each,
23  and Tanios by having his backpack with the equipment he bought
24  and brought down, that Mr. Khater knew about and took advantage
25  of, so in that assault helped lead to the ultimate breach of the

1  Capitol.  Mr. Tanios is liable as an aider and abettor.

2      So to me, the evidence, when you look at it, suggests that

3  the defendants had a plan.  They talked over maybe at the foot

4  of the Capitol when they got there and saw what was going on,

5  but at some point they had a plan to use those devices as

6  weapons at the Capitol, which was executed, that they did that.

7  They purchased them, they brought them down, and they talked

8  about it while -- at least they talked while they were standing

9  there together, and then after that went ahead and used the

10  weapons.

11      I don't think there's any evidence whatsoever that they

12  belonged to any extremist group of rioters.  I do not see

13  any indication of that.

14      But I think that Judge Howell's *Chrestman*'s conclusions

15  are relevant in "a defendant's carrying or using during the riot

16  a dangerous weapon" -- that's the mace, referring to whatever it

17  may be -- "indicates at least some degree of preparation for the

18  attack and an expectation that the need to engage in violence

19  against law enforcement or, indeed, the Legislative branch,

20  might arise.

21      "These motives and steps taken in anticipation of an attack

22  on Congress speak volumes to both the gravity of the charged

23  offense, as a premeditated component of an attempt to halt the

24  operation of our democratic process, and the danger a defendant

25  poses not just to the community in which he resides, but to the

1   American public as a whole."  That's *Chrestman* at 8.

2       So I think the factors weigh in relative culpability

3   and detention, although there is no proof of belonging to an

4   extremist group or broad coordination with many others prior

5   to the riot, and I took that into consideration.

6       Dangerous weapon.  Well, there's no question that we had

7   here mace which may be legal, but it's used as a dangerous

8   weapon.  As I said, you can have a pocket knife which is legal,

9   but when you use it, it becomes a dangerous weapon.

10      Mr. Khater knew that they had bear spray, because he asked

11  for it, and they obviously anticipated having it with them.

12  That constitutes under the law a dangerous weapon, 18 U.S.C.

13  111, and there are many cases finding that.  I'm not going to

14  cite all the cases.

15      And I've said before, the distinction between carrying

16  something for your protection or as a weapon and using it is

17  vital.  It's different if you've carried something and never

18  used it, but where you used it to attack the police, who are

19  standing there not attacking you directly, to me is a violent

20  act, which is among some of the more violent acts that took

21  place that day.

22      So the defendants both carried and used -- Mr. Khater,

23  and Mr. Tanios through Mr. Khater -- what was at that point

24  dangerous weapons to assault police officers.  That indicates

25  to me a level of dangerousness.  There's no rational reason to

1    use that when the police were under attack by a riotous mob

2    and then you used your weapons against the police to facilitate

3    that attack.

4        There's no evidence, as I said, of any leadership roles

5    or that they were engaged with anyone else, but the conduct does

6    seem to me that we have preparation and execution of a violent

7    assault on the officers during a riot intended to interfere

8    Congress's constitutional mandate.

9        The video evidence is clear.  Mr. Khater deliberately

10   sprayed the officers trying to hold the line against the rioters

11   who broke through and breached the Capitol very near where he

12   sprayed.  The officers sustained serious injuries.

13       Mr. Tanios aided in that.  He coordinated the direct

14   assault.  He had purchased the materials to be used.  Mr. Khater

15   obviously has more flagrant conduct than Mr. Tanios; however,

16   finding they both acted together, they fall in the elevated

17   category of dangerousness under *Munchel*.  I cannot find other

18   than the factors I've reviewed support detention at this time.

19       It concerns me because these two gentlemen are law-

20   abiding, respected individuals in their community, and it makes

21   it very difficult for the Court to make this conclusion.  But

22   the government's evidence and what happened on the videos and

23   their phone calls that they did, and the backpack that had the

24   materials in it, and what happened seem to me that it's clear

25   that there's little doubt as to what transpired.

1      Mr. Khater raised this canister in his right arm.  He

2   aimed it in the direction of the officers.  He meant to spray

3   it in their faces.  He did so.  And then a few seconds later,

4   he sprayed it directly in Officer Edwards' as well as other

5   officers' face, who had no protection.  You saw them all

6   affected by it, pour water in their faces, trying to recover.

7   You see a few seconds later Mr. Khater sprays another group

8   of officers.  Sprays another group of officers.

9      The weight of the evidence strongly presented supports

10  the government's contention that the defendants are a threat to

11  the community.  I recognize the excellent backgrounds of each

12  defendant.  Mr. Tanios has no felony convictions.  Mr. Khater

13  has 18 character letters or more.  He has a $15 million bond he

14  said he'll post.  Both the history and characteristics of these

15  defendants do not weigh in favor of detention.

16     But they still committed this attack on uniformed police

17  officers.  I don't find a way around that.  I've already

18  discussed Mr. Tanios's situation, that he did not deny

19  Mr. Khater access to the backpack by his words and what he

20  did, and I will not go through that again.  And he seems to

21  be elevated to the category of dangerousness under *Munchel* and

22  what Judge Sullivan said in an interesting case called *Whitton*.

23  I'll quote Judge Sullivan:

24     "[Defendant's] and his codefendant's conduct on January 6,

25  2021, was among some of the most violent conduct that took place

that day, and the Court cannot ignore that reality when
evaluating his character and the potential threat he continues
to pose to the community.  Nor has the D.C. Circuit said the
Court must turn a blind eye to [Defendant's] violent conduct
when determining whether he poses a danger that warrants
pretrial detention to safeguard the community."

Seems to me the logic applies here both to Mr. Tanios and
Mr. Khater.  Now, Mr. Khater, he's obviously elevated to the
higher category of dangerousness as contemplated by the Circuit,
violent conduct against a police officer directly, combined with
his planning, that is support.  He knew where the materials
were, he went and got them from the backpack, and he delivered
I believe an unprovoked attack to assault two groups of law
enforcement officers.

Judge Lamberth says, "the defendant's alleged conduct
in this case - assaulting a police officer - shows a disregard
for law and order and for those sworn to uphold it."  That's
*Fairlamb* at page 21.  So at a point of violently assaulting
police officers, multiple officers, it seems to me that the
defendants are showing themselves to be a danger to the
community.

I have all the pretrial release conditions set forth,
including the one, the $15 million bond secured by a 1.5 million
on the New Jersey property of the family.  I will not find that
the proposed condition of release would adequately mitigate the

danger posed to the community given the seriousness of the

conduct and the disregard for law enforcement that this conduct

demonstrates.

As Judge Lamberth has said, those who show a complete

disregard for the law suggests that no conditions can reasonably

assure the safety of the community during a riot where law

enforcement's under attack.  The defendant Khater coolly walked

up to officers and assaulted them, twice, with a chemical spray.

And you can compare *Sabol* at 18 where the Court is not

persuaded this proposed home confinement plan would mitigate

his proposed danger to the community based on his demonstrated

willingness to engage in violence in furtherance of his beliefs.

Or *Chrestman*:  "His very actions on January 6 make apparent

that that this defendant will follow his beliefs and his fellow

gang members, even when the laws designed to protect our

democracy prohibit his conduct. Together, these factors

demonstrate that he cannot be trusted to abide by any conditions

of release that might be imposed instead of pretrial detention."

So here we have egregious actions of the defendant,

Mr. Khater, with the assistance of Mr. Tanios, on January 6

that demonstrate they pose a danger to the community regardless,

in Mr. Khater's case, of a substantial bond that he wishes the

Court to accept.  I don't see how the bond guarantees anything

in the nature of protecting the community if this activity that

generated this occurs again.

1     It seems to me that we're at a position where the evidence

2   shows that they brought these materials with them that they

3   could use to attack individuals, whether it was originally to

4   attack others that disagreed with their position, or in this

5   case where they used it to attack the police and injure the

6   police who were standing still, doing their job, not doing

7   anything particularly to these individuals.  And that video

8   speaks for itself.  And when that happened, the line broke and

9   the Capitol was rushed.

10     So despite the excellent background and characters of these

11   individuals who normally would be entitled to be out on bond,

12   I just cannot find in this case the violence against the police

13   that occurred that I think without provocation directly to

14   Mr. Khater -- there's no evidence he was sprayed until after he

15   finished his spraying directly -- that I can overlook that and

16   find that these two individuals should be released on some type

17   of bond requirements to attempt to protect the public from those

18   who have used these as an offensive weapon and to assist the

19   violent mob in attacking the Capitol.

20     So, for those reasons, I'm going to deny the motions for

21   the review of the detention order and release of Mr. Tanios

22   filed to reverse the magistrate judge and for Mr. Khater's

23   memorandum to support his motion of pretrial release.

24     I will say that this type of case is unfortunate and

25   that I have tried to carefully review the evidence as possible,

1    having reviewed this probably now three times fully all the

2    materials that have been submitted, all the arguments and the

3    most recent ones today, as well as reviewing all the videos and

4    all of the recordings that have been produced for the Court to

5    consider in reaching this conclusion under the *Munchel*

6    opinion and the *Worrell* opinion, that these defendants cannot

7    be released on bond, finding the government has shown by clear

8    and convincing evidence they remain a danger to the community.

9         All right.  What we need to do is to have the government

10   and each counsel meet and try to determine the evidence that

11   they have to have produced, the discovery, any motions the

12   defendants wish to file.

13        Defendants have raised a legitimate issue as to

14   communication with their clients and how they're being held.

15   I'm very cognizant of the article in *The Washington Post*.  I

16   will indicate for the record, however, that that occasion has

17   come about because of the pandemic, that the jail originally

18   was overrun with the COVID virus.  It was very serious among

19   the guards and a majority of the prisoners.

20        After litigation on behalf of the prisoners, controls

21   were put into effect by Judge Kotelly of our court, bringing

22   in experts, and the jails operated under their expert advice as

23   to how to contain the virus.  It has been remarkably successful.

24        As of today we have data reports, and as of today there

25   is one positive case of a brand-new prisoner who just got

admitted to the prison, tested positive and immediately

isolated.  The lockdown is severe, and I understand the

concerns about that, and hopefully this can be -- the

vaccinations can progress a change.  But it has stopped

the virus from spreading in the jail.

But I recognize the concerns that the prisoners have, and

the Court is willing to facilitate any kind of communication

that could be made available for the prisoners.  I don't know

the prisoners' status of their own vaccinations or not and

whether or not, if they get vaccinated, they have more freedoms

or not.  But if there is a concern about communication and the

Court can effectuate some relief for that, I will try to do

that.  You can bring it to my attention.

All right.  So I want to set a status call in 30 days.

I don't want this case to linger.  It's one of the more serious

cases, obviously, but the government has phenomenal quantities

of evidence of all the homemade videos the rioters used.  But we

do have to try to move this along now that these gentlemen have

been detained, and I don't want this to be sitting around with

nothing happening for an undue amount of time.

Mr. Light, where are you on providing discovery, and what

has happened so far?

MR. LIGHT:  Your Honor, we hope to begin rolling out

first batches within the coming days to both parties.

THE COURT:  Do you have protective orders in place?

1    MR. LIGHT:  Yes, Your Honor.  Your Honor, as to those

2    protective orders, I will note that the order requires that the

3    defendants sign a copy of the protective order.  There's a

4    waiver page or acceptance of understanding on the protective

5    order itself.  And I understand the difficulties right now in

6    communicating with the clients, so I'll just point out that that

7    does need to be done prior to the production of discovery.

8    THE COURT:  All right.  Well, it is a problem.

9    With counsel both from out of state trying to communicate with

10   their clients, there should be a way to arrange at least a Zoom

11   conference with the clients.  And my courtroom deputy, Harold

12   Smith, can help with that.  You talk to Mr. Smith.  He's very

13   good at doing all this and finding time for the defendants to

14   have a Zoom conference.  A personal conference is more difficult.

15   It may require that counsel be vaccinated before they can get

16   into the jail, but I will help coordinate that if I possibly can.

17   June 10th is one possibility for me in the afternoon.

18   I have matters all morning already.  A later date I can -- the

19   following week I can do a short hearing the morning of the 15th.

20   I can do a hearing the morning of the 16th.  So it's up to you

21   all and your calendars, and Harold's got to find out when the

22   jail is available for the Zoom conference.

23   MR. TACOPINA:  The 16th would be preferable for us,

24   I think.

25   THE COURT:  The 16th would be a morning hearing.

1    I've got matters in the afternoon already.

2              MR. TACOPINA:  That's fine, Your Honor.

3              THE COURT:  Is the 16th available in the morning?

4              THE DEPUTY CLERK:  Your Honor, Harold Smith, Courtroom

5    Deputy.  The 16th is available.

6              THE COURT:  What time is it?

7              THE DEPUTY CLERK:  10 a.m.

8              THE COURT:  All right.  Government's all right with

9    the 16th?

10             MR. LIGHT:  Yes, Your Honor.

11             MS. GROSS:  That works for us.

12             MR. TACOPINA:  Your Honor, will we be getting a

13   written order?  It may be required if we we're going to be

14   considering any appellate route.

15             THE COURT:  Yes.  I'll issue an order in conjunction

16   with my bench opinion.  It'll be a simple order because it's

17   been an hour of entertaining a bench opinion.  We'll take care

18   of it for you.  And I anticipated a potential appeal, so that's

19   fine.  The 16th at 10 a.m. we'll be back, unless other things

20   interfere with that from the Court of Appeals or otherwise.

21   So 16 June at 10 a.m.

22             MR. LIGHT:  Your Honor, if I may?  Your Honor, we just

23   ask that the Court toll the time under the Speedy Trial Act

24   pursuant to the Court's standing order in light of the pandemic.

25             THE COURT:  The Court -- does either defendant through

1    counsel object to the excluding time from today for the month

2    until the date we have in June?

3        I hear no objections, so I'm going to grant the extension

4    of the speedy trial from today till our next conference date on

5    the grounds of public and the interest of the defendants to look

6    at all the evidence -- they haven't seen all the evidence yet --

7    and prepare for the case as they deem necessary.  So I think

8    that's clear.

9        We also have an outstanding order from our Chief Judge,

10    stopping all trials, that has continued and been renewed many,

11    many times until August 31st of this year in any event, extending

12    the speedy trial time in general till that date.  I think we

13    should have specific times for each case as well, but there's a

14    generic order that we can't do trials until August 31st unless

15    we change that because of the vaccinations that will allow us to

16    do trials quicker than that.  We're beginning to do experimental

17    trials right now to see if it will all work.

18        All right.  We'll be back in June as indicated at 10 a.m.,

19    and we'll issue an order later today.  Thank you, counsel, for

20    all the work.  I appreciate it.

21            MR. TACOPINA:  Thank you, Your Honor.

22            MS. GROSS:  Thank you.

23            MR. LIGHT:  Thank you, Judge.

24        (Proceedings adjourned at 10:50 a.m.)

25

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter. *

*/s/ Bryan A. Wayne*
Bryan A. Wayne

* PLEASE NOTE:

This hearing was taken via videoconference in compliance with U.S. District Court standing order(s) during the COVID-19 pandemic.  Transcript accuracy may be affected by the use of electronic technology, including but not limited to sound distortion or audiovisual interference.