## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    **V.**                                            **CASE NO. 1:21-CR-222 (TFH)**

**GEORGE PIERRE TANIOS,**

    **Defendant.**

## <u>DEFENDANT'S MOTION TO TRANSFER TRIAL</u>

The Defendant, George Pierre Tanios, by and through counsel, pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure, requests a change of venue due to significant prejudice in the District of Columbia ("DC") prohibitive of a fair and impartial trial, invoking his right to a fair trial by an impartial jury under the Fifth and Sixth Amendments. Mr. Tanios asserts that detrimental pretrial publicity and community prejudice in DC is so likely to have affected the jury pool that the venire must be presumed as tainted. Defendant proposes that this matter be moved to the Northern District of West Virginia, where he resides with his family, where his witnesses are located, and where he was arrested.

## Introduction

Mr. Tanios is looking forward to trial, but as this Court may have predicted, Mr. Tanios is extremely concerned that he will not receive a fair trial in DC. Frankly, with all due respect, DC is a wildly inappropriate location for a jury trial in this case. As other similarly situated defendants have argued, there is no expectation of a fair and impartial jury in DC.

Mr. Tanios is a high-profile defendant in the DOJ's largest and perhaps most important investigation in history.[1]  Mr. Tanios is well known to people in DC as the "Sandwich guy" from West Virginia mainly because between January 6, 2021, and April 19, 2021, at least, he was allegedly connected to the death of Officer Brian Sicknick, one of the handful of first responders who tragically died after the January 6 incident. This narrative was all over DC, in every form of newspaper, television station, blog, and social media platform such as Twitter, Facebook, and Instagram. You name it and there was a story in it about Mr. Tanios and his alleged role in Officer Sicknick's death after January 6.

---

[1] In support of this motion, undersigned counsel asked our investigator to conduct research on the content generated from the primary media outlets in DC. He quickly determined that there are too many articles, posts, stories, and videos to collect as a practical matter.  To simplify the process, he shifted the focus toward raw numbers.  On February 22, 2022, he conducted a variety of advanced Google searches so we could begin to measure the amount of press coverage by media outlets in DC. For example, our investigator initiated an advanced Google search for content after January 6, 2021, using the search terms "capitol riot" OR insurrection on washingtonpost.com, which returned **12,200** results.  An advanced Google search using the search terms George AND Tanios "capitol riot" OR insurrection on washingtonpost.com yielded **57** results, while the terms "sicknick" "capitol riot" OR insurrection yielded **182** results on washingtonpost.com.

Today, Mr. Tanios is not charged with homicide, given that the medical examiner's report determined Officer Sicknick died of natural causes, but Mr. Tanios will stand trial for ten other extremely serious felony charges, including an assault upon Officer Sicknick.  It will be impossible, in our view, for Mr. Tanios to select qualified, impartial, and truly unbiased jurors given (1) the incredible volume of remarkably negative pretrial publicity in DC about January 6; (2) the continuous stream of negative productions by DC media outlets about Mr. Tanios; and (3) the generalized trauma experienced by DC residents during and after the protest and violent attack on the U.S. Capitol.  In many critical ways, DC and its residents are the alleged victims in every January 6 case because DC hosts the U.S. Capitol Building, many DC residents work for the Government, and DC is the epicenter of our Democracy, where the majority of residents are connected in some meaningful way to politics and political events.  This trial must be held elsewhere.

## Legal Standard

The Firth Amendment and the Sixth Amendment entitle criminal defendants to a fair trial by an impartial jury. "The great value of the trial by jury certainly consists in its fairness and impartiality." *United States v. Burr*, 25 F. Cas. 49, 51 (CC Va. 1807). An impartial jury is required under the Constitution and has been required since the times of common law. *Id; see also Patton v. Yount*, 467 U.S. 1025 (1984). "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955).

Federal Rule of Criminal Procedure 21(a) instructs that district courts "must transfer the proceeding … if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." While the Sixth Amendment provides a right to trial by "jury of the State and district wherein the crime shall have been committed," the Constitution's place-of-trial prescriptions do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial. *Skilling v. United States*, 561 U.S. 358 (2010); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences.").

The Supreme Court has overturned convictions where the district court failed to transfer for venue after prejudicial pretrial publicity. *See, e.g., Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. State of Texas*, 381 U.S. 532 (1965); *Sheppard v. Maxwell*, 384 U.S. 333 (1966). The Supreme Court has also reversed convictions where there was a "huge . . . wave of public passion" and where the venire possessed "a belief in [defendant's] guilt." *Irvin v. Dowd*, 366 U.S. 717, 728 (1961) (vacating a conviction and death sentence for the trial court's failure to transfer venue for community publicity); *see also Patton v. Yount*, 467 U.S. 1025 (1984).

Over the past few decades, we have seen federal courts interpret the Supreme Court's venue case law as requiring a show of community effect, in addition to a show of pretrial publicity. For example, in the prosecution for bombing of the federal building, in *United States v. McVeigh*, the district court in the Western District of

Oklahoma ruled that the "emotional burden of the explosion and its consequences" and the community prejudice against the defendants accused of the bombing in Oklahoma City was so great that they could not obtain a fair and impartial trial in the state of Oklahoma. *United States v. McVeigh*, 918 F.Supp. 1467 (W.D.Okla. 1996).

## Argument

*Voir dire* is extremely valuable, but it has limits.[2] V*oir dire* usually does not entail inquiring into jurors' ideas about each and every element of charged offenses. And asking jurors to state whether they have reached conclusions that they cannot set aside during the trial will not reveal all prejudgment because jurors do not always understand which of their opinions are relevant, and what they cannot take for granted without proof beyond a reasonable doubt. *See United States v. Tsarnaev*, 968 F.3d 24, 58 (1st Cir. 2020), *cert. granted*, 141 S. Ct. 1683 (2021) (observing that asking potential jurors about whether they had read anything that influenced their opinion or otherwise made them biased in Boston Marathon bombing case was not likely to reveal bias in part because prospective jurors may be unaware of such bias) (quoting *Smith v. Phillips*, 455 U.S. 209, 221-22 (1982)) (internal quotations omitted).

Although many defendants request a transfer of venue citing pretrial publicity, the Sixth Amendment is concerned with whether jurors' conclusions will be induced

---

[2] We use the term *voir dire* generally. We understand there are many forms of *voir dire,* including Court-directed *voir dire*, attorney-directed *voir dire*, and individual *voir dire*. As well, we have had positive experiences with juror questionnaires, particularly in high-profile cases and cases involving sensitive subject matter. However, given the highly unusual circumstances and acute prejudice discussed in this motion, no combination of methods would be adequate to select an impartial jury in DC in our assessment.

by "*any* outside influence" rather than "only by evidence and argument in open court[.]" *Skilling v. United States*, 561 U.S. 382, 378 (2010) (quoting *Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454, 462 (1907) (opinion for the Court by Holmes, J.)) (emphasis added). That outside influence can be public print *or* "private talk." *Id.* (quoting *Patterson*, 205 U.S. at 462). It can be "the sheer number of victims." *See id* at 437-38 (Sotomayor, J., concurring in part and dissenting in part) (quoting with approval the Fifth Circuit's statement that the district court overseeing Skilling's trial "seemed to overlook that the prejudice came from more than just pretrial media publicity, but also from the sheer number of victims"); *id*. at 437 (quoting with approval the Fifth Circuit's statement that district court lost sight of the proposition that "[t]he evaluation of the volume and nature of reporting is merely a proxy for the real inquiry: whether there could be a fair trial by an impartial jury that was not influenced by outside, irrelevant sources").

Or the improper outside influence may be the *nature* of the media to which jurors have been exposed, or its prevalence close to the time to trial, or its tendency to provoke identification with those directly affected by the conduct at issue that the jurors feel a personal stake in the outcome. *Skilling,* 561 U.S. at 383 (2010); *United States v. McVeigh*, 918 F. Supp. 1467, 1473 (W.D. OK 1996). The outside influence may also be "such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience." *McVeigh*, 918 F. Supp. at 1473.

In *Skilling v, United States*, although the Court established no bright line rules about when media can contribute to a constitutional need to transfer venue, Justice Ginsberg noted that when the Court has ruled that a case should have been transferred to a new venue in order to preserve defendants' constitutional right to trial by an impartial jury, it has emphasized (1) "the size and characteristics of" the district with venue, (2) the extent to which news stories about the defendant contained confessions "or other blatantly prejudicial information of the type readers or viewers" in that venue "could not reasonably be expected to shut from sight," and (3) the time that has passed between periods of significant publicity and the trial (if any has). *Skilling,* 561 U.S. at 382-83; *id.* at 381 ("[P]resumption of prejudice . . . attends only the extreme case.").

In *Rideau v. Louisiana,* the Court concluded that no *voir dire* could cleanse the taint of a video of the defendant's uncounseled interrogation and "confession," which had been broadcast in a small town several times before trial. *Rideau*, 373 U.S. at 727. Here, potential jurors have been exposed to hours and hours of videos of the events of January 6, and hundreds of pictures of those events. Even digital newspapers include video footage embedded in articles.

Whereas the single recording at issue in *Rideau* captured a "dramatically staged confession of guilt," the hundreds of January 6 videos and photos circulated by DC media outlets over the last thirteen months capture the scene of the alleged January 6 crimes, and many of the alleged crimes themselves, including potential crimes committed by many other people easily confused with Mr. Tanios. Vivid

images splashed across DC newspapers, television, and other media outlets for the last thirteen months show people scaling the Capitol walls, hoisting a hangman's gallows and noose, waving Confederate flags, putting their feet on the desks in the Capitol, rifling through papers on desks in the Capitol, milling about and hanging from the balconies in the Senate Chamber, and appearing to try to break into the House chamber, among hundreds of other scenes.[3] Many of the images – and the general impression that arises from viewing many of them – are "likely imprinted indelibly in the mind of anyone who [viewed them]," just like the recorded interrogation in *Rideau* would have been. *See Skilling*, 561 at 382-83. Much of this evidence has nothing to do with Mr. Tanios, but because DC jurors have been inundated with these videos, they cannot be expected to know that, or to "shut [them] from sight" during trial. *See Skilling*, 561 U.S.

As such, the pretrial publicity in DC about January 6 has been "blatantly prejudicial," and distinguishable from the type of press coverage that failed to convince the majority of the Supreme Court that prejudice should be presumed in Skilling. *Skilling*, 561 U.S. at 382 (distinguishing publicity in that case from the publicity in *Rideau* because it contained "[n]o evidence of the smoking gun variety" and was not so shocking that it could not be shut from jurors' minds during trial).

---

[3] *See, e.g.* Staff, "No pictures, no pictures': The enduring images from Jan. 6," *The Washington Post* (Jan. 4, 2022), at https://www.washingtonpost.com/nation/interactive/2022/photos-jan-6-capitol/ (last visited 2/3/22); D. Bennett, et al., "41 minutes of fear: A video timeline from inside the Capitol siege," *The Washington Post* (Jan. 16, 2021), at https://www.washingtonpost.com/investigations/2021/01/16/video-timeline-capitol -siege/ (last visited 2/3/22).

The concept of presumption of prejudice is predicated on the idea that the institution of the jury is occasionally fallible. Of course, jurors are almost always trusted to represent their views wholly and accurately during *voir dire*, and to follow the Court's instructions if selected for the jury. But the Supreme Court has recognized that a failsafe may be needed under a narrow set of conditions that make it more difficult for a juror to accurately assess their own bias, or to ignore salient community attitudes about the case. *See Rideau*, 373 U.S. at 726-27 (concluding that no review of "the *voir dire* examination of the members of the jury" was necessary to determine in that case that "that due process of law. . . required a [transfer]"); *see also, e.g.*, *Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality [during *voir dire*] might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows [during *voir dire*] is often its father.").

Here, under these extreme circumstances, in such a colossal, historical, and important case, with a high-profile defendant, prejudice must be presumed, and the Court should transfer this case to another venue to preserve Mr. Tanios's rights under to the Constitution, or at least pursuant to the Court's discretion under Rule 21 of the Rules of Criminal Procedure. *See Skilling*, 561 U.S. at 446 n.9 (Sotomayor, J., concurring in part and dissenting in part) (noting that district courts have wide discretion to transfer a case to another venue even if trial in the originating venue

would not violate the Constitution, and that it would not have been imprudent to transfer the Skilling case given "the widely felt sense of victimhood among Houstonians and the community's deep-seated animus toward Skilling" even if these issues did not preclude a constitutional trial).

Finally, Mr. Tanios is scheduled for trial in June 2022.  By that time, other January 6 defendants will have gone to trial. The already-small pool of even potentially eligible jurors will shrink, and pretrial publicity will likely experience other spikes. As such, the list of reasons for the Court to presume prejudice will only grow in the time between now and trial. To ensure that Mr. Tanios's trial proceeds as scheduled, and that he is tried by an impartial jury, the Court should transfer this case to another suitable venue as soon as possible.

**Conclusion**

Mr. Tanios has demonstrated that he faces significant prejudice in the District of Columbia, prohibitive of a fair and impartial jury trial. He rightfully has invoked his constitutional guarantee to a fair trial by an impartial jury under the Fifth and Sixth Amendments, and aptly requests a transfer of venue to the Northern District of West Virginia, where he and his witnesses reside, pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure.


Respectfully submitted,

**GEORGE PIERRE TANIOS**

By:     /s/ Elizabeth B. Gross
        Elizabeth B. Gross
        WV State Bar No. 11567
        Federal Public Defender Office 230 West Pike Street, Suite 360
        Clarksburg, West Virginia 26302 Tel. (304) 622-3823
        Fax. (304) 622-4631
        E-Mail: Beth_gross@fd.org

11

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on February 24, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia and that a copy of which will be sent to the following:

> **Anthony F. Scarpelli, Esq.**
> **U.S. ATTORNEY'S OFFICE**
> **555 Fourth Street, NW**
> **Washington, DC 20530**
> **(202) 252-7707**
> **Fax: (202) 514-8707**
> **Email: anthony.scarpelli@usdoj.gov**
>
> **Gilead I. Light, Esq.**
> **U.S. ATTORNEY'S OFFICE**
> **555 4th Street NW**
> **Ste 4832**
> **Washington, DC 20816**
> **202-252-6880**
> **Email: gilead.light@usdoj.gov**

By:    s/ Elizabeth B. Gross
       Elizabeth B. Gross
       WV State Bar No. 11567
       Federal Public Defender Office 230 West Pike Street, Suite 360
       Clarksburg, West Virginia 26302 Tel. (304) 622-3823
       Fax. (304) 622-4631
       E-Mail: Beth_Gross@fd.org